

## NUMBER 13-08-00685-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**JUAN ANTONIO GONZALEZ,**                                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                              **Appellee.**

### On appeal from the 398th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Rodriguez**

Appellant Juan Antonio Gonzalez challenges his conviction by a jury for capital murder, for which he was sentenced to life imprisonment. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2010). By six issues, Gonzalez argues that: (1) the evidence at trial was legally and factually insufficient to support his conviction; (2) the trial

court erred in admitting as evidence certain firearms found with Gonzalez at the time of his arrest because the firearms amounted to inadmissible character conformity evidence and were unfairly prejudicial; (3) the trial court erred in admitting the firearms because the State failed to give adequate notice of its intent to use the firearms as extraneous offense or bad acts evidence; (4) the trial court erred in denying Gonzalez's motion for mistrial after a police officer testified that Gonzalez had a prior arrest; (5) the trial court denied Gonzalez effective assistance of counsel and his due process rights when it "effectively denied" Gonzalez the indigent funds and sufficient time to retain the services of a firearms expert; and (6) the jury was erroneously instructed in the law-of-the-parties application paragraph regarding the requisite culpable mental state for retaliation, the alleged aggravating crime that elevated the killing from murder to capital murder in this case. We affirm.

## I. BACKGROUND

Gonzalez was indicted as follows for capital murder:

> [O]n or about the 10th of July A.D., 2004, . . . in Hidalgo County, Texas, [Gonzalez] did then and there intentionally cause the death of an individual, namely, Alfonso Cruz Leos, by shooting the victim with a firearm and [Gonzalez] was then and there in the course of committing or attempting to commit the offense of retaliation against Alfonso Cruz Leos . . . .[1]

*See id.* Gonzalez pleaded not guilty, and from April 26 to May 9, 2006, the case was tried to a jury.[2] After the close of the evidence, the jury convicted Gonzalez of capital murder, and the trial court sentenced him to life imprisonment in the Institutional Division

---

[1] Gonzalez was also indicted for murder, *see* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003), but the State dismissed that count after the jury convicted Gonzalez of capital murder.

[2] This was the second trial of Gonzalez's case. The first, in November 2005, ended in a mistrial.

of the Texas Department of Criminal Justice.   Gonzalez filed a motion for new trial, which was denied by the trial court.   This appeal followed.

## II.  SUFFICIENCY OF THE EVIDENCE

By his first issue, Gonzalez challenges the legal and factual sufficiency of the evidence supporting his capital murder conviction.   Specifically, Gonzalez argues that: (1) the evidence does not prove either that Gonzalez himself shot, or caused the death of, Alfonzo Cruz Leos or that his participation or actions contributed to the killing so as to support a law-of-the-parties finding; and (2) there is no evidence that the murder was committed as an act of retaliation.

## A.   Standard of Review and Applicable Law

Gonzalez challenges both the legal and factual sufficiency of the evidence presented against him.   However, the Texas Court of Criminal Appeals's 2010 *Brooks v. State* opinion abolishes this distinction.   323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The court held that "the *Jackson v. Virginia* legal sufficiency standard is the only standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt."   *Id.*   In light of the *Brooks* holding, this Court will only conduct a legal sufficiency review.

When conducting this sufficiency review, the appellate court must ask itself "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" and not whether it believes the evidence establishes the verdict

3

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "[T]he jury is the sole judge of a witness's credibility[] and the weight to be given the testimony." *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). The reviewing court should not act as a thirteenth juror that substitutes its own opinion of the credibility and weight of the evidence for that of the fact finder's. *See Brooks*, 323 S.W.3d at 905. Instead, the reviewing court must "resolve inconsistencies in testimony in favor of the verdict" and then ask whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

To measure legal sufficiency, we use the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* As indicted in this case, a person commits the offense of capital murder if he "intentionally commits the murder in the course of committing or attempting to commit . . . retaliation." TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits murder if he "intentionally or knowingly causes the death of an individual . . . ." *Id.* § 19.02(b)(1) (West 2003). A person commits the offense of retaliation "if he intentionally or knowingly harms or threatens to harm another by an unlawful act . . . in retaliation for or on account of the service or status of another as a[n] . . . informant . . . ." *Id.* § 36.06(a)(1)(A) (West Supp. 2010). A person is guilty as a

4

party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." *Id.* § 7.01(a) (West 2003). A person "is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2003).

It is not necessary that the evidence directly proves the defendant's guilt; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). "Circumstantial evidence alone may [also] be used to prove that a person is a party to an offense." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006) (citations omitted); *Escobar v. State*, 28 S.W.3d 767, 774 (Tex. App.—Corpus Christi 2000, pet. ref'd). A fact finder may support its verdict with reasonable inferences drawn from the evidence, and it is up to the fact finder to decide which inference is most reasonable. *Laster v. State*, 275 S.W.3d 512, 523 (Tex. Crim. App. 2009).

### B. The Evidence

At trial, the evidence established that between 7:00 and 8:00 a.m. on July 10, 2004, Leos was shot while he was mowing the front yard at his home on Charro Street in North Mission, Texas. Leos died later that morning at McAllen Hospital from multiple gunshot wounds. The State presented the following testimony about the events of that morning and the investigation that followed.

5

Erica Lucero was Leos's wife. She testified that Leos was a law enforcement informant. Because he was an informant, Leos had suffered multiple attempts on his life. For this reason, Lucero testified that she and Leos had fortified their home: they strung barbed wire around their yard, installed a steel plate in their front door, and put in bullet-proof windows in their bedroom. Lucero testified that Leos always carried a gun on his waist.

On the morning of July 10, 2004, Lucero heard gunshots while Leos was outside mowing the yard. She looked out the window and saw a maroon Grand Prix with two to three persons inside it; shots were being fired from the Grand Prix. Lucero then picked up what she described as an "AK-47" from their bedroom, went outside, and began shooting at the car. She could not say whether she hit the car or anyone in it. After the car drove away, she found Leos on the ground; he had been shot. Lucero took Leos to the hospital, but he died before surgery.

Lucero believed that either Raul Montoya, who had allegedly tried to kill Leos in January 2004, or Carlos Milton, also known as La Bota, were responsible for killing Leos. Lucero testified that Leos and La Bota were friends from the same town in Mexico. The week before Leos was killed, Leos gave the police information about La Bota. La Bota was arrested two days before the shooting. Lucero believed that La Bota knew that Leos had informed on him.

Fulgencio Salinas, M.D. was the forensic pathologist who performed the autopsy on Leos. Dr. Salinas testified that Leos received multiple gunshot wounds and died as a result of those wounds. The wounds were "distant" type gunshot wounds, which means

6

that the shots were fired from more than three feet away. Dr. Salinas testified that the nature and characteristics of Leos's wounds were consistent with shots fired from a high-caliber weapon.

Richard Hitchcox, the State's firearms expert, testified about the weapons recovered during the investigation of the case. Hitchcox testified that two 7.62 by 39 millimeter caliber semiautomatic rifles were recovered: one was recovered from a "storage area underground" and the other from Leos and Lucero's car. One .380 caliber semi-automatic handgun was recovered from Leos and Lucero's car, as well; the evidence showed that Leos was carrying this handgun at the time of his shooting. Hitchcox testified that two of the weapons recovered from the motel where Gonzalez was arrested were a .380 caliber semi-automatic pistol and a 9 millimeter caliber "Smith and Wesson" pistol.[3]

Hitchcox also testified about the bullets recovered from Leos's body and the bullet casings recovered at the scene. The bullets recovered from Leos's body were fired from a rifle; Hitchcox could neither confirm nor deny that the bullets were fired from any of the rifles recovered during the investigation. Twenty-two casings were recovered from the scene of the shooting: thirteen 7.62 caliber casings; five .380 caliber casings; and four 7.62 by 39 caliber casings. Hitchcox testified that none of the 7.62 by 39 caliber casings cycled through the rifle recovered from the underground storage; he could neither confirm nor deny that those casings cycled through the rifle found in Leos and Lucero's car. Hitchcox was able to match the .380 caliber casings to Leos's semi-automatic pistol.

---

[3] The evidence established that a total of eight firearms were recovered during the course of the investigation. The evidence also showed that three firearms were recovered from the motel where Gonzalez was arrested.

Hitchcox testified that he was unable to determine how many firearms were used at the scene and that, in a majority of cases, he is unable to identify the firearm used in the crime.

Jose Jaime Rodriguez, an investigator with the major crimes division of the Hidalgo County Sheriff's Office, testified regarding the investigation of Leos's killing. Investigator Rodriguez testified that Leos was a paid informant and that the information Leos provided to law enforcement was valuable. At least three attempts had been made on Leos's life for being an informant. Leos provided Investigator Rodriguez with information regarding, in particular, "pseudo-cops" and narcotics trafficking and dealing. Investigator Rodriguez testified that pseudo-cops are people who dress up like police officers and burglarize homes under that pretense. Investigator Rodriguez testified that La Bota ran a ring of drug dealers and pseudo-cop home invaders. After his investigation, Investigator Rodriguez concluded that La Bota's organization retaliated against Leos for providing information that led to La Bota's arrest.

A couple days before his killing, Leos had provided Investigator Rodriguez information about La Bota's criminal operations; La Bota was arrested as a result on July 8, 2004, two days before the shooting of Leos. Investigator Rodriguez began his investigation by questioning Jessie Villarreal, who was known to be part of La Bota's organization. Villarreal led Investigator Rodriguez to Jorge Rocha. On July 12, 2004, Investigator Rodriguez went to Rocha's home and obtained statements from both Rocha and Rocha's wife, Paula Frias. The information obtained from Rocha and Frias led Investigator Rodriguez to Juan Carlos Vasquez, also known as Miran, and "a subject

8

known as Juan Cancos."   "Juan Cancos" was eventually identified as Gonzalez.

An anonymous tip then led Investigator Rodriguez to Francisco Navarro, a crack cocaine dealer in the area; Navarro was reportedly scared and had buried a gun in his yard.  Investigator Rodriguez recovered an assault rifle that was buried in Navarro's backyard and a handgun from Navarro's car.  At that point, the case turned cold for approximately two months.  Investigator Rodriguez believed that Miran and Gonzalez were "on the run."

On September 13, 2004, Investigator Rodriguez received a tip that Miran was living in a house in McAllen, Texas.  Investigator Rodriguez set up surveillance at that house.  Two men were observed leaving the house, and Investigator Rodriguez tried to stop them but they fled.  After a two-hour car and foot chase, Miran was eventually arrested after he was found hiding in a car at his sister's house.  Miran was holding a handgun at the time of his arrest.

Investigator Rodriguez soon received another tip that Gonzalez was at a motel in McAllen and that he had a blue vehicle.   Investigator Rodriguez again set up surveillance and observed a blue vehicle drive up to the motel; two persons exited the vehicle and went into the motel.  Those persons were Gonzalez and Raul Alba.  Alba eventually came out of the motel, at which point Investigator Rodriguez detained him and Alba stated that "he didn't want no problems."   Alba told him where to find Gonzalez.  Investigator Rodriguez went to that room, talked Gonzalez out, and arrested him.  Investigator Rodriguez testified that he found two weapons in that room.[4]

---

[4] It was established that three firearms were ultimately recovered from the motel room.

Alba testified that he first met Gonzalez at La Bota's house. He had previously seen Gonzalez and Miran there together; both worked for La Bota. Alba also testified that Leos and La Bota were friends.

After the killing of Leos, Alba testified that he saw Gonzalez at a motel. While they were at the motel, Gonzalez told Alba that "he and Miran" had killed Leos because Leos was an informant and they were losing drug sales because of him. Gonzalez told Alba that Leos was mowing his lawn "when they killed him." Alba testified that he later saw Gonzalez when a friend wanted to "score some drugs." They all went to a motel in McAllen and "part[ied]" all night, doing cocaine and smoking marihuana. As also described by Investigator Rodriguez, the police eventually came to the motel, and Alba was arrested and made a statement to the police. Alba testified that he had warrants out for his arrest regarding his aggravated assault probation, but testified that the State did not promise him anything for his testimony.

On cross-examination, Alba testified that he used cocaine while he was on probation but that his probation was never revoked. He also testified that he was high on crack cocaine when he gave his statement to the police. In his statement, Alba did not tell the police about Gonzalez's statement to him that they killed Leos because Leos was an informant. Alba testified he first told the State that Gonzalez had made those statements when he met with the prosecutor "a few months ago." Alba stated that when he talked to the prosecutor, he was afraid he was going to go to jail and "that's the reason [he] told [them] what [they] wanted to hear." However, Alba then testified that he "told the truth" and the prosecutor never told him what to say.

10

Frias, Rocha's wife, testified that on the morning of July 10, 2004, around 8:15 a.m., she heard loud knocking on the doors and windows of their house. Miran, Gonzalez, and another man she did not recognize came in the back door of the house. They had a gun. Frias testified that they appeared "messed up," "panicked," and "just looked scary." Miran was bleeding from his shoulder. Rocha awoke and led the three men to the living room. Frias stayed in the hallway and eavesdropped because she wanted to know what was happening. Frias heard Gonzalez say, "Lla lo quebramos," which was translated to mean, "We have already broken him." Frias explained that "Lla lo quebramos" means "a lot of things" but, to her, it means "to kill." Frias testified that the three men eventually left in a black Grand Prix.

When the police came to take Frias's statement on July 12, 2004, Frias testified that she "was nervous, rowdy," was "screaming" because she "was scared," and that the police handcuffed her. Frias acknowledged that her trial testimony was the first time she mentioned a gun. In her statement to the police, Frias did not mention that Miran, Gonzalez, or the unknown man had a gun when they came to her house that morning. Frias also acknowledged that, in her statement to police, she said that she only recognized Miran that morning and that it was Miran who made the "Lla lo quebramos" comment. However, Frias then stated that she did not initially tell the police about the gun because she was afraid of her husband, Rocha. At the time of trial, Rocha was in prison for capital murder; he did not want Frias to testify. Frias testified that La Bota and Rocha were friends and that La Bota was in jail on July 10, 2004.

11

### C. Gonzalez as the Primary Actor or Party Participant

Gonzalez contends that the evidence was insufficient because: Lucero, the only eyewitness to the shooting, could not identify which person in the Grand Prix was shooting; the witnesses who testified most directly as to Gonzalez's involvement—Alba and Frias—were unreliable, biased, and offered contradictory testimony; and there was no physical evidence linking Gonzalez to the murder. As a result, Gonzalez argues that the evidence was insufficient to show he was the shooter—i.e., the primary actor in killing Leos—or that he aided and abetted the killing of Leos and was thus guilty under the law of the parties. We disagree. The evidence was sufficient to prove either theory of capital murder.

First, Lucero's inability to identify the person or persons shooting from the Grand Prix on that morning was not fatal to the State's case. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (en banc) ("Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence."); *see also Perry v. State*, No. 14-09-00937-CR, 2010 WL 5132569, at *3 (Tex. App.—Houston [14th Dist.] Dec. 14, 2010, no pet.) ("'[P]ositive' eye-witness testimony is not necessary to determine appellant's identity."). There was ample circumstantial evidence from which the jury could infer either that Gonzalez was the actual shooter or, at the least, participated as a party. *See Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd) ("[I]dentity may be proven by inferences."). The testimony established that Gonzalez and Miran worked for La Bota, a known pseudo-cop ring leader and drug dealer who had been arrested two days before the shooting based on information from Leos. *See*

12

*Massey v. State*, 826 S.W.2d 655, 658 (Tex. App.—Waco 1992, no pet.) (citing *Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972)) ("[E]vidence of a motive is the type of evidence that may be used to prove that an accused committed an offense, because it is relevant as a circumstance tending to prove the commission of the offense."). Lucera testified that when she heard gunshots on the morning of July 10, 2004, she exited her and Leos's house, saw two to three men firing guns from a dark-colored Grand Prix, and discovered Leos shot in the front yard. Dr. Salinas, the medical examiner who performed Leos's autopsy, testified that the nature of Leos's gunshot wounds showed that the gun that shot him was fired from a distance of greater than three feet away, from which the jury could infer Leos's gunshot wounds resulted from the shots fired from the Grand Prix. Shortly after Leos was shot, Gonzalez, Miran, and an unidentified man appeared at Rocha and Frias's house in an agitated state and carrying a gun. Miran was bleeding from his shoulder, and based on Lucera's testimony that she fired her AK-47 at the car, the jury could have inferred that Miran was hit by Lucera's shots. According to Frias, Gonzalez made a statement in Spanish that can be translated, at its worst, as "to kill" or, in the least, as "we have already broken him." Frias testified that Gonzalez, Miran, and the unidentified man drove away from her house in a dark-colored Grand Prix. Investigator Rodriguez testified that he believed Miran and Gonzalez were "on the run," which is a further circumstance of guilt. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (recognizing that "a fact finder may draw an inference of guilt from the circumstance of flight") (citations omitted). Finally, Alba testified that Gonzalez admitted to killing Leos because Leos was hurting their drug dealing business. From the

13

foregoing circumstantial evidence, the jury could have rationally determined either that Gonzalez intentionally caused the death of Leos himself or encouraged and aided in the killing by Miran or the third unidentified man. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), 19.02(b)(1), 19.03(a)(2); *see also Powell*, 194 S.W.3d at 506.

Second, although it is true that the testimonies of both Frias and Alba posed potential issues of bias, credibility, and consistency, it is not the job of this Court to resolve those issues. *See Brooks*, 323 S.W.3d at 905. Gonzalez points out that Alba admitted to using cocaine even though he was on probation; did not have his probation revoked despite this, implying that the State did not act to revoke in exchange for Alba's testimony and cooperation; was high on crack cocaine when he gave his statement to police; and testified to facts at trial that he did not include in his original statement to police. Gonzalez also contends that Frias was nervous and "rowdy" when she gave her initial statement to the police; was handcuffed by police at that point, implying that Frias had motivation to cooperate with the State; and testified to facts at trial that she did not include in her statement to police. However, the jury is the ultimate judge of credibility and weight to be given to testimony, and it was free to credit the testimony by Alba and Frias that was favorable to the guilty verdict. *See Lancon*, 253 S.W.3d at 707. We will not disturb that determination on appeal. *See Curry*, 30 S.W.3d at 394 (directing the reviewing court to resolve any inconsistencies in the testimony in favor of the verdict).

Finally, physical evidence of Gonzalez's involvement was not necessary. We acknowledge that the ballistic and other firearms-related evidence admitted through Hitchcox's testimony was largely inconclusive. But Hitchcox also testified that he rarely

14

is able to identify a murderer from such firearms determinations. And here, as discussed previously, the ample circumstantial evidence connecting Gonzalez to Leos's killing was sufficient. *See Kuciemba*, 310 S.W.3d at 462; *Hooper*, 214 S.W.3d at 13. So, we cannot conclude the jury was irrational in crediting this circumstantial evidence to convict Gonzalez of capital murder. *See Jackson*, 443 U.S. at 318-19; *Curry*, 30 S.W.3d at 406.

## D. Evidence of Retaliation

Gonzalez further challenges the evidence of retaliation. Again, we conclude that the evidence was sufficient to support the jury's verdict in this regard. There was evidence that Leos was an informant who had had multiple attempts made on his life because of that fact; as a result, Leos and Lucero's home was heavily fortified. The testimony established that, two days before his shooting, Leos had provided the police with information on La Bota. La Bota ran a ring of pseudo-cop home invaders and drug dealers. The testimony established that Gonzalez was affiliated with La Bota's gang. After the shooting, Gonzalez went to the home of Rocha, who the evidence showed was also an associate of La Bota's. Like other associates of La Bota, Gonzalez was arrested in possession of multiple firearms. Crucially, Gonzalez admitted to Alba that he and Miran had killed Leos because Leos was hurting their drug business. Moreover, both Lucero and Investigator Rodriguez believed that Leos was killed in retaliation for providing information on La Bota. In sum, the foregoing evidence shows La Bota's motive to retaliate against the informant Leos, connects Gonzalez to La Bota's gang and reveals Gonzalez's motivation to harm Leos, and, as such, provides a sufficient basis from which the jury could determine that Leos was murdered by Gonzalez because of his

15

status as an informant. *See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A).

## E. Summary

Having reviewed all the evidence presented at trial in the light most favorable to the verdict, we conclude the evidence was such that a rational jury could have concluded: either that Gonzalez caused the death of Leos or, through his encouragement and aid, was criminally responsible for the killing of Leos; and that the murder was committed in retaliation for Leos's providing information to law enforcement about La Bota's criminal organization. *See id.* §§ 7.01(a), 7.02(a)(2), 19.03(a)(2), 36.06(a)(1)(A); *see also Jackson*, 443 U.S. at 318-19. The evidence was therefore sufficient. Gonzalez's first issue is overruled.

## III. ADMISSION OF THE FIREARMS

By his second and third issues, Gonzalez challenges the trial court's admission of the firearms found with Gonzalez when he was arrested.

### A. Character Conformity and Probative Value v. Potential for Prejudice— Rules 404(b) and 403

In his second issue, Gonzalez argues that the trial court's admission of the firearms violated rule 404(b)'s prohibition against character-conformity evidence. Gonzalez also argues that the firearms' probative value was outweighed by their unfair prejudice to him, in violation of rule 403.

#### 1. Standard of Review

Whether extraneous offense evidence has relevance apart from character conformity is a question for the trial court and so, too, is a ruling on the balance between probative value and prejudicial effect, although that balance is always slanted toward

16

admission of otherwise relevant evidence. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Thus, we review the trial court's decision on the admissibility of such evidence for an abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). Under an abuse of discretion standard, we will uphold the decision of the trial court unless the ruling rests outside the zone of reasonable disagreement. *Id.*

## 2. Applicable Law

Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's character and/or to show that the person acted in conformity with that character. *See* Tex. R. Evid. 404(b). However, such evidence may be admitted if it is relevant to motive, identity, intent, opportunity, preparation, plan or absence of mistake. *Id.* Moreover, as the Texas Court of Criminal Appeals has explained, "It has long been the rule in this State that the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986) (en banc) (citing *Archer v. State*, 607 S.W.2d 539, 542 (Tex. Crim. App. 1980)).

To constitute an extraneous offense, the evidence must show a crime or bad act and that the defendant was connected to it. *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992) (en banc); *Arthur v. State*, 11 S.W.3d 386, 390 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). This "necessarily involve[s]" some sort of "prior criminal conduct" by the defendant. *Harris v. State*, 738 S.W.2d 207, 224 (Tex. Crim. App. 1986) (en banc) (op. on reh'g). If the evidence fails to show that an offense

17

was committed or that the accused was connected to the offense, then it is not evidence of an unadjudicated extraneous offense. *Id.*; *Yancey v. State*, 850 S.W.2d 642, 644 (Tex. App.—Corpus Christi 1993, no pet.).

But even if the evidence does not invoke the extraneous misconduct prohibition of rule 404(b), the opponent of the evidence may further object under rule 403. *Casey*, 215 S.W.3d at 879 (citing *Santellan v. State*, 939 S.W.2d 155, 169-70 (Tex. Crim. App. 1997) (en banc)); *see* TEX. R. EVID. 403. Under rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." TEX. R. EVID. 403. "Probative value" means "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey*, 215 S.W.3d at 879 (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006)). "Unfair prejudice" means a tendency to suggest decision on an improper basis. *Id.* (citations omitted). "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Id.* at 880 (citations omitted).

**3. Analysis**

At trial, the State admitted into evidence eight firearms that were found during the course of the police's investigation. As discussed previously, three of those firearms were found in the motel room where Gonzalez was arrested. It is undisputed that none of those firearms were connected to the scene of the shooting. Gonzalez argues that the firearms were inadmissible 404(b) extraneous misconduct evidence—we disagree.

First, mere possession of a gun "is not, in and of itself, a criminal offense or a bad act." *Robinson v. State*, 236 S.W.3d 260, 270 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Thus, we do not believe that the fact that Gonzalez was arrested in the presence of various firearms necessarily amounts to extraneous offense evidence. *See Lockhart*, 847 S.W.2d at 573; *Harris*, 738 S.W.2d at 224.

Regardless, the firearms were relevant to Gonzalez's motive and intent and constituted a relevant circumstance of his arrest—the firearms were circumstantial evidence of Gonzalez's connection to La Bota's organization and were thus relevant to his motive and intent to commit retaliation. Gonzalez's possession of the firearms linked him to La Bota's gang of pseudo-cops and drug dealers; in particular, the testimony at trial established that other affiliates of La Bota's gang who were arrested in the course of the investigation of Leos's murder also possessed firearms at the time of their arrests. Moreover, the circumstances of Gonzalez's arrest—a motel room where Gonzalez was supplying drugs to others and from which the State's witness Alba exited and informed law enforcement that he "didn't want no problems," both of which facts implicate Gonzalez's connection to La Bota and the inherent suspicion of the situation in the motel room—render the firearms admissible extraneous conduct evidence. Therefore, even if we assume that the firearms were extraneous misconduct evidence, they were admissible under 404(b)'s motive and intent exception to the general prohibition and as surrounding facts and circumstances of the charged offense. *See* TEX. R. EVID. 404(b); *see also Moreno*, 721 S.W.2d at 301.

19

Gonzalez further argues that, even if admissible under rule 404(b), the prejudicial effect of the firearms evidence outweighed its probative value at trial. *See* TEX. R. EVID. 403. As discussed above, the evidence was probative of Gonzalez's connection to La Bota's gang and, therefore, to the State's efforts to prove that Leos was murdered in retaliation for informing on La Bota. *See Casey*, 215 S.W.3d at 879; *see also* TEX. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). We conclude, therefore, that the evidence was relevant. Arguably, the prejudicial effect was the potential impression the guns created in the minds of the jury of an armed man on the run from the law. *See Alexander v. State*, 88 S.W.3d 772, 779 (Tex. App.—Corpus Christi 2002, pet. ref'd) (holding that the admission of a .357 magnum revolver found with the defendant at the time of his arrest had a substantial and injurious effect on the jury where the only other evidence of the defendant's identity as the killer was the questionable testimony of the eye-witness); *see also* TEX. R. EVID. 403. Assuming without deciding that the admission of the firearms did unfairly prejudice Gonzalez, we would still conclude that the error had but a slight effect on the jury.

Error in the admission of prejudicial evidence is not one of constitutional dimensions; therefore, we disregard the error unless it affected Gonzalez's substantial rights. *See* TEX. R. APP. P. 44.2(b); *see also Alexander*, 88 S.W.3d at 779. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.

20

Crim. App. 1997) (citations omitted). A criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Here, as discussed above, there was ample evidence of Gonzalez's guilt. The testimony at trial circumstantially placed Gonzalez at the scene of the shooting. He appeared at Frias's house shortly after the shooting with Miran and a third man in an agitated state and carrying a gun and made an incriminating statement in Spanish that could be translated as "we killed him" or "we have already broken him." He admitted to Alba that he and Miran killed Leos because Leos was hurting their drug sales. Multiple witnesses testified regarding Gonzalez's connection to La Bota's gang of pseudo-cops and drug dealers. Finally, in our review of the record, it appears that the State spent relatively little time on the firearms found with Gonzalez during the presentation of its case and mentioned those firearms only briefly in its closing argument. We therefore conclude that the admission of the firearms, if erroneous, had but a slight effect on the jury's verdict. *See id.*; *see also* TEX. R. APP. P. 44.2(b). Gonzalez's second issue is overruled.

### B. Inclusion of Firearms in State's Pre-trial Notice

By his third issue, Gonzalez argues that the trial court erred in admitting the firearms found at the time of Gonzalez's arrest because the State's notice of intent to introduce extraneous offenses did not include the firearms. "[U]pon timely request by the accused in a criminal case," the State must give "reasonable notice . . . in advance of

21

trial of [its] intent to introduce" extraneous misconduct evidence.   TEX. R. EVID. 404(b); *see Hernandez v. State*, 176 S.W.3d 821, 822 (Tex. Crim. App. 2005).   Because no constitutional error is involved when evidence of uncharged misconduct is admitted without notice, we must disregard any error that did not affect Gonzalez's substantial rights.   *See* TEX. R. APP. P. 44.2(b); *McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005).   In the context of the State's failure to give notice of its intent to introduce extraneous misconduct evidence, the harm will flow from the surprise to the defendant and the inability to prepare his defense in light of that evidence.   *See Hernandez*, 176 S.W.3d at 825–26; *see also Hayden v. State*, 66 S.W.3d 269, 272 & n.16 (Tex. Crim. App. 2001) ("[T]he purpose of Rule 404(b) notice is to prevent surprise" and "to allow a defendant adequately to prepare to defend against the extraneous offense evidence.").

Here, as noted previously, we do not believe that mere possession of a firearm is, in and of itself, extraneous misconduct, so we question whether the State's introduction of the firearms even invokes rule 404(b).   *See Robinson*, 236 S.W.3d at 270; *see also Lockhart*, 847 S.W.2d at 573; *Harris*, 738 S.W.2d at 224.   What's more, Gonzalez makes no assertion or argument that he was "surprised" or otherwise harmed by the State's failure to include the firearms in its rule 404(b) notice.   *See* TEX. R. APP. P. 38.1(i). Neither does Gonzalez state or explain how his defense strategy would have been different had the State notified him of its intent to offer the firearms.   *See id.*; *see also Hernandez*, 176 S.W.3d at 826.   Even if Gonzalez had made these arguments, however, we find no indication of any surprise in the record before us.   This was Gonzalez's second trial of the matter, and at the first trial, the State introduced the same firearms

22

about which he now complains in this issue. Accordingly, as reasoned by the court of criminal appeals in *Hernandez*, it "strains credulity" for Gonzalez to contend that he had no notice that the State would introduce the firearms at the second trial or that, after being faced with the same firearms evidence six months earlier in the first trial, he had inadequate time or ability to prepare his second-trial defense to consider those firearms. *See* 176 S.W.3d at 826 (holding that the defendant was on notice of the State's intent to introduce the audiotapes of his statements to police where the defendant had been furnished a copy of the tapes before trial and the highly relevant nature of the tapes virtually ensured the State would attempt to use them at trial). Therefore, the error, if any, by the trial court in admitting the firearms without pretrial rule 404(b) notice did not affect Gonzalez's substantial rights so there was no harm. *See* TEX. R. APP. P. 44.2(b). We overrule Gonzalez's third issue.

## IV. MOTION FOR MISTRIAL

By his fourth issue, Gonzalez argues that the trial court erred in denying his motion for mistrial after Investigator Rodriguez mentioned in his trial testimony that Gonzalez had a prior arrest. The complained-of testimony and subsequent objection and exchange arose in the context of Investigator Rodriguez describing his surveillance of the motel where Gonzalez was arrested with Alba:

[Prosecutor]: So you said they [Gonzalez and Alba] arrived in a blue vehicle?

[Rodriguez]: Yes.

[Prosecutor]: Did they park the vehicle there at the Dell Inn?

[Rodriguez]: Yes.

23

| | |
|---|---|
| [Prosecutor]: | And who were those two – were you able to identify who those persons were? |
| [Rodriguez]: | I recognized Cancos [Gonzalez]. |
| [Prosecutor]: | Okay.   And how is it that you recognized him? |
| [Rodriguez]: | From photos we had received from prior arrests that he had – |
| [Defense counsel]: | I'm going to object, Your Honor. |
| [The Court]: | Sustained. |
| [Defense counsel]: | I'm going to ask the jury be instructed to disregard that remark. |
| [The Court]: | The jury will be instructed to disregard that remark. |
| [Defense counsel]: | We appreciate the Court's ruling, feel error has attached and would ask for a mistrial. |
| [The Court]: | Motion for mistrial is denied. |

After the trial court instructed the jury to disregard Investigator Rodriguez's remark, the jury was asked to leave the courtroom, and counsel for the State and Gonzalez conferred with the court.   At this point, the prosecutor informed the trial court that Investigator Rodriguez's remark caught her off guard because she had expressly admonished him not to mention Gonzalez's prior arrests during his testimony.   Counsel for Gonzalez reiterated his position that the jury was irreparably harmed by the mention.   The trial court then repeated its denial of Gonzalez's motion for mistrial.

"An appellate court reviewing a trial court's ruling on a motion for mistrial must utilize an abuse of discretion standard of review."   *Wead v. State*, 129 S.W.3d 126, 129

24

(Tex. Crim. App. 2004) (citations omitted). This standard requires that we view the evidence in the light most favorable to the trial court's ruling, consider only those arguments before the court at the time of the ruling, and uphold the court's ruling if it falls within the zone of reasonable disagreement. *Id.* (citations omitted).

A mistrial is required only when the evidence is "so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind." *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) (en banc) (citations omitted); *see Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). In other words, it is an "appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000)). Typically, an instruction by the trial judge to disregard will suffice to cure an inadmissible reference to or implying of extraneous offenses. *See Kemp*, 846 S.W.2d at 308. This is because we generally presume that the jury follows the trial court's instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *see also Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988) (en banc) (holding that the jury presumed to follow the trial court's instruction to disregard evidence). To rebut this presumption, Gonzalez must point to evidence that the jury failed to follow the trial court's instruction to disregard Investigator Rodriguez's remark. *See Thrift*, 176 S.W.3d at 224 (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)).

In this case, we cannot conclude that the singular, unembellished mention of Gonzalez's "prior arrests" amounted to the sort of clearly inflammatory evidence or extreme circumstance that would warrant a mistrial. *See Kemp*, 846 S.W.2d at 308; *see also Ocon*, 284 S.W.3d at 884. Investigator Rodriguez's comment was uninvited by the prosecutor's questioning, and the prosecutor, herself, was surprised by the improper remark. Moreover, Gonzalez has pointed to no evidence in the record, and we find none, that the jury did not follow the trial court's prompt instruction to disregard the comment. *See Thrift*, 176 S.W.3d at 224. As such, we conclude that the trial court's instruction to disregard rendered Investigator Rodriguez's comment harmless, and the court did not abuse its discretion in denying Gonzalez's motion for mistrial. *See Ladd*, 3 S.W.3d at 567; *see also Wead*, 129 S.W.3d at 129. Gonzalez's fourth issue is overruled.

## V. GONZALEZ'S FIREARMS EXPERT

By his fifth issue, Gonzalez argues that the trial court denied him effective assistance of counsel and his due process rights when it "effectively denied" him the indigent funds and sufficient time necessary to retain the services of a firearms expert. Gonzalez contends, in particular, that the trial court "repeatedly stonewalled" his attempts to secure a firearms expert. We disagree that Gonzalez was denied access to his own expert.

The Texas Court of Criminal Appeals has held that if an indigent defendant "requests an expert who can buttress a viable defense, due process is implicated when the trial court refuses the request." *Taylor v. State*, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996) (en banc); *see Ake v. Oklahoma*, 470 U.S. 68, 76 (1985); *see also* U.S.

26

CONST. amend XIV. The relevant inquiry regarding whether a defendant is constitutionally entitled to an expert is whether the expert can provide assistance that is "likely to be a significant factor" at trial. *Taylor*, 939 S.W.2d at 152 (citing *Rey v. State*, 897 S.W.2d 333, 339 (Tex. Crim. App. 1995) (en banc)) (other citations omitted).

In January 2006, Gonzalez filed two motions with the trial court for the appointment of an expert. In those motions, Gonzalez alleged that "there are a number of detailed and technical issues" related to ballistics and firearms which are "likely to be a significant factor at trial"; for that reason, Gonzalez argued that the "assistance of a ballistic[s] expert is necessary so that [he] may have the basic tools to present his defense . . . ." After a hearing on January 26, 2006, the trial court granted Gonzalez's motion. Over the next three months, counsel for Gonzalez appeared before the trial court five times presenting various problems with obtaining his expert, including fee payment arrangements and the logistics of transporting the firearms, casings, and bullet fragments to the expert in Dallas, Texas. At each appearance, the trial court expressed concerns over what it characterized as delays in bringing the case to trial.[5] But at each appearance, the trial court granted Gonzalez's requests for additional time and resources. It appears that Gonzalez was unable, before trial commenced, to obtain a report from his expert or arrange for his expert to testify.

---

[5] For instance, at a March 23, 2006 appearance where the trial court approved Gonzalez's request to pay the expert up-front, the court noted that she had granted Gonzalez's motion "[a] long time ago" and commented, "I'm not sure I'm going to wait for that report to come back. It's incumbent upon you all to do that." At a March 30, 2006 appearance where Gonzalez informed the trial court that the expert was requesting an additional $5000 to travel down to pick up the evidence, the court stated, "I will confer [about the best way to transport the evidence to the expert], but I'm not willing to spend a lot of money on these experts." At three hearings in April 2006 at which Gonzalez and the trial court were attempting to resolve the problems with transporting the evidence to Dallas for testing, the court commented that it was "incumbent on [Gonzalez] to move this process forward" and expressed that she would call the case to trial if Gonzalez did not "move on this thing [i.e., obtaining the expert report and testimony]."

27

Having viewed the entire record, we cannot conclude that the trial court "effectively denied" Gonzalez access to his requested expert. It is clear from the record that, in balancing Gonzalez's interests with the State's limited resources, the trial court made provisions for Gonzalez to have the resources he was entitled to under the law. *See Rey*, 897 S.W.2d at 337 (identifying judicial economy as one factor for the trial court to weigh in determining whether to grant an indigent defendant's request for an expert). Moreover, aside from a cursory mention that an expert was needed to counter the testimony of the State's firearms expert, Gonzalez has not explained to this Court how the appointment of an expert would have been a significant factor at trial. *See Taylor*, 939 S.W.2d at 152. In sum, our review of the record revealed that the trial court granted Gonzalez's request; we are not persuaded that Gonzalez's constitutional rights were violated by his inability to effectively marshal the services of the expert before trial. Gonzalez's fifth issue is overruled.

## VI. LAW-OF-THE-PARTIES JURY CHARGE

By his sixth issue, Gonzalez argues that there was error in the law-of-the-parties application paragraph of the capital murder jury charge. Specifically, Gonzalez argues that the jury was erroneously instructed in that paragraph regarding the requisite culpable mental state for retaliation, the alleged aggravating crime that elevated the crime from murder to capital murder in this case.

The jury was charged on capital murder, in relevant part, as follows:

> Our law provides that a person commits the offense of Murder when the person intentionally or knowingly causes the death of an individual.

> A person commits the offense of Capital Murder when such person

28

intentionally commits the murder in the course of committing or attempting to commit the offense of Retaliation.

2.

Our law provides that a person commits an offense if he intentionally or knowingly threatens to harm another by an unlawful act in retaliation for or on account of the service of a person who has reported the occurrence of a crime.

. . . .

5.

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

6.

Now, if you find from the evidence beyond a reasonable doubt that on or about JULY 10, 2004, . . . [Gonzalez] did then and there intentionally cause the death of . . . [Leos] by shooting the victim with a firearm and [Gonzalez] was then and there in the course of committing or attempting to commit the offense of retaliation against [Leos];

OR

If you find from the evidence beyond a reasonable doubt that on or about JULY 10, 2004, . . . [Miran] did then and there intentionally cause the death of . . . [Leos] by shooting the victim with a firearm and [Miran or an unknown person] was then and there in the course of committing or attempting to commit the offense of retaliation against [Leos], and that . . . [Gonzalez] then and there knew of the intent, if any, of [Miran or the unknown person] to shoot and kill [Leos], and [Gonzalez] acted with intent to promote or assist the commission of the offense by [Miran or the unknown person] by encouraging, directing, aiding, or attempting to aid

29

[Miran or the unknown person] to commit the offense of causing the death of [Leos] . . . , then you will find [Gonzalez] guilty of the offense of Capital Murder.

. . . .

7.

To warrant a conviction of [Gonzalez] of the offense of Capital Murder, you must find from the evidence beyond a reasonable doubt not only that . . . [Gonzalez] or Co-Defendant was engaged in the commission or attempted commission of the retaliation . . . , if any, but also that [Gonzalez] or Co-Defendant . . . shot [Leos with the intention of thereby killing him. Unless you find from the evidence beyond a reasonable doubt that [Gonzalez] or Co-Defendant . . . specifically intended to kill . . . [Leos] when he shot him, you cannot convict him of the offense of Capital Murder.[6]

Gonzalez contends that the second paragraph under section 6 of the jury charge—the law-of-the-parties application paragraph—allowed the jury to convict Gonzalez of capital murder without finding that he intended to assist in Miran or the unknown third man's commission of retaliation. In other words, Gonzalez contends that the jury could have convicted Gonzalez of capital murder if it believed that Gonzalez only intended to assist Miran or the unknown third man in causing Leos's death.

In analyzing a jury charge issue, our initial inquiry is whether error exists in the charge submitted to the jury. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If error is found, the degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* If the defendant properly objected to the erroneous jury charge, reversal is required if we find "some harm" to the defendant's rights. *Id.* Here, Gonzalez concedes that he did not object at trial to the

---

[6] As noted by the State, the jury charge for capital murder does not appear in the clerk's record on appeal. Gonzalez does not challenge this circumstance. We have drawn our quotation of the relevant portions of the jury charge from the trial court's recitation of the charge in the reporter's record.

30

jury charge issue he raises on appeal, so we may only reverse if the record shows egregious harm. *See id.* at 743-44. To determine whether a defendant suffered egregious harm, we assess the degree of harm in light of (1) the entire jury charge, (2) the state of the evidence, including contested issues, (3) the arguments of counsel, and (4) any other relevant information in the record. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *see Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985) (op. on reh'g). Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the defendant of a valuable right," or "vitally affect a defensive theory." *Ngo*, 175 S.W.3d at 750; *see Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (en banc) (citing *Almanza*, 686 S.W.2d at 172).

Assuming without deciding that the jury charge erroneously instructed the jury that it could convict Gonzalez as a party without finding that he intended to both assist in causing the death and the retaliation, we still conclude that Gonzalez was not egregiously harmed by the error. As discussed previously, the evidence was sufficient to prove either that Gonzalez was the primary actor or participated as a party in the capital murder of Leos. "Where the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless." *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986) (en banc) (citing *Brown v. State*, 716 S.W.2d 939, 945–46 (Tex. Crim. App. 1986) (en banc)) (other citations omitted). Here, the evidence was such that the jury could have found that Gonzalez was the shooter and that he killed Leos in retaliation for the arrest of La Bota. Any supposition by us that the jury convicted Gonzalez under the law-of-the-parties paragraph would be entirely speculative.

31

Thus, Gonzalez has not shown that he suffered any harm from the error in the jury charge, much less the sort of harm that affected the very basis of his case, deprived him of a valuable right, or vitally affected a defensive theory. *See Ngo*, 175 S.W.3d at 750; *Hutch*, 922 S.W.2d at 171. Gonzalez's sixth issue is overruled.

## VII. CONCLUSION

Having overruled all of Gonzalez's issues, we affirm the trial court's judgment.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
7th day of July, 2011.